## JOHN E. SINGLETON *v.* THE STATE.

1. EXPRESS MALICE may be evidenced otherwise than by verbal declarations. It may be proved by external circumstances discovering that inward intention, such as lying in wait, antecedent menaces, former grudges, and deliberate compassings; or by the nature and character of the act done, the instrument used, the deliberation shown in preparing it, as well as the manner in which the killing was committed.

2. MURDER committed in the perpetration, or in the attempt at the perpetration, of arson, rape, robbery, or burglary is, under the Penal Code of this state, murder in the first degree; the malice, in such cases, being evidenced by the act of killing for such purposes.

APPEAL from the District Court of Bee. Tried below before the Hon. H. CLAY PLEASANTS.

A clear and comprehensive summary of the most material facts is given in the opinion of the court.

*P. O'Docharty,* for the appellant. The appellant was

indicted for the crime of murder, alleged in the indictment to have been committed with "express malice." To this indictment he pleaded "not guilty." A verdict of "guilty" was rendered, and his punishment fixed at death.

On behalf of the appellant it is respectfully submitted that, the state having elected to put the defendant upon trial, and declared in the indictment against him for murder committed with express malice, he could not be convicted of the offense except upon proof establishing beyond doubt the fact of the killing having been committed with such express malice as is known to, and defined by, the law. Any other killing, however aggravated it may have been, or for whatever purpose it may have been committed, will not justify a conviction upon the indictment in this case; hence, the instructions asked for the defendant upon this point were proper, and should have been given to the jury.

The state having declared in the bill against the defendant for murder committed with "express malice," is held to the charge as set out, as much so as any other pleader. "The allegations and the proof must reciprocally meet and conform to each other." The defendant went to trial upon the bill, and all proof other than what tended to establish the killing with "express malice" should have been excluded from the jury; and the instructions of the court, as they all tended to raise in the minds of the jury the belief that the defendant could be convicted upon circumstantial proof of a robbery having been committed upon the deceased, were erroneous. The state was not required to declare upon any particular manner of killing for the purpose of obtaining a conviction of murder in the first degree; but, having done so, it must abide by the election. But, should the court hold that the state is not bound to show that the crime was committed as declared in the bill, we will consider if the evidence is sufficient to sustain the conviction—if there is no reasonable doubt of the guilt of the defendant.

The proof shows that the deceased was drunk and bois-

terous before he left Beeville; so much so that the keeper of the hotel had the accused to remove him from the house. Both the defendant and the deceased were drinking. It appears from the witnesses, Shubert and the mail carrier, that the defendant was crazy from the effect of drink when they met. What other construction can be placed upon his actions? Here the evidence stops until the deceased is found on the road, dead, next morning. The deceased had evidently gotten out of the hack, and was lying down in the position he was found in when he was killed. The parties had been delayed and stopping on the road; and what is more in accordance with the acts of drunken men than that the deceased got out of the hack, laid down in the road, and the defendant drove off and left him. This view of the facts is not only possible, but probable.

As to the effects of the deceased, which it is shown the accused had in his possession, it is reasonable to believe, and the proof tends to show, that they were given to and placed in his possession at Beeville, where the deceased had them out exhibiting them to the landlord at the hotel, and that they remained in his possession up to the time of the separation of the parties. The fact that the accused afterwards sought to appropriate the draft to his use is a circumstance which makes against him; but it is respectfully submitted that it is insufficient to establish his guilt.

The conviction in this case is based entirely upon circumstantial evidence. To sustain a conviction upon such proof, the circumstances must be such as to exclude every reasonable hypothesis inconsistent with the guilt of the defendant. Now, let us review all the circumstances of this cause as developed by the evidence.

We have seen that the watch and draft found with the accused, and the only property of deceased identified, may have been, and in all probability were, placed in his posses-

sion by the deceased, or by the landlord of the hotel at Beeville. The deceased had been alighting from the hack on the road; he was very drunk; was evidently lying down on the side of the road asleep when killed; the range of the ball, the position of the body, all show these facts. Then, what more reasonable conclusion (if even the intention to rob the deceased is admitted) than that the deceased went to sleep, and that the accused drove off, taking with him his valuables.

The murder may have been committed by another after the accused left. Deceased was lying on the highway where persons repeatedly passed. The evidence shows that a drove of cattle had been driven by the morning the body was discovered. Might not the killing have been done by those engaged in driving the cattle? If not done by some of the party, why did they not report the fact of the body being there? It was impossible for them not to have seen it. The witness Pettus, who followed after the cattle, saw it and made immediate report. Or the killing may have been done by some other party, who passed in the night and killed the deceased whilst he slept. The fact of some pieces of money being found near the deceased shows that the killing was done at night. Had it been done during the day the murderer would have taken the money, no matter how small the amount. Or the killing may have been done by the accused upon a sudden quarrel having arisen between them. A quarrel is usually the consequence of parties being drunk. Or it may have been committed accidentally; and although these are matters of defense, and should in general come from the defendant, in mitigation of the punishment, it is respectfully submitted that before a conviction can be had of murder in the first degree, committed with express malice, the state must establish the guilt of the party affirmatively, and must *negate* every inconsistent hypothesis.

*George McCormick*, Assistant Attorney General, for the State.

ECTOR, Presiding Judge. The indictment charges John E. Singleton, the appellant, with the murder of John Dwyer, in Bee county, on the 20th of July, 1875. At the June term, 1876, of the district court of Bee county the defendant in the indictment was put upon his trial, convicted by the jury of murder of the first degree, and his punishment assessed at death. There was a motion for a new trial for the following reasons :.

"1st. Because the court, in its instructions to the jury, was mistaken as to the law applicable to this cause in this : that the court instructed the jury that express malice, in the commission of the offense of murder, could be inferred from the fact of the defendant having been found in possession of property which was shown to have belonged to, and been in the possession of, the deceased a short time before his death.

" 2d. Because the court refused to give the instructions asked by the defendant, which were proper and applicable to the facts of the case.

" 3d. Because the indictment in this case is for the crime of murder committed with express malice, and the court, from its general instructions, gave the jury to understand that a conviction could be had under the indictment upon proof of a robbery having been committed at or after the killing ; which instruction was contrary to law.

" 4th. Because the verdict of the jury is contrary to the facts of this cause and the law as applicable thereto.

" 5th. Because there is no evidence in this cause to sustain the verdict of the jury."

The motion for a new trial was overruled. The counsel for the defendant has assigned the following errors :

" 1st. The court, in its instruction to the jury, erred in

this : that the court instructed the jury that a conviction could be had under the indictment in this cause upon proof other than that of express malice.

" 2d. The court erred in refusing the instructions asked by the defendant.

" 3d. The court erred in refusing to grant a new trial."

The first assignment of error is not well taken. The indictment charges that the killing was done with express malice. The court, in its instructions to the jury, defined murder in the first and murder in the second degree, and express and implied malice. When an indictment charges that the killing was done with express malice (as it does in this case), it is the duty of the presiding judge to deliver to the jury a written charge, in which he shall distinctly set forth the law applicable to the case as shown from the testimony, and the jury, properly applying the law as given in the charge of the court to the testimony before them, can find the defendant guilty of murder in the first degree, or for any lesser degree of culpable homicide. The charge did properly submit to the jury to ascertain from the evidence whether the defendant was guilty of murder in the first or murder in the second degree. The jury were instructed that, if they had a reasonable doubt of the guilt of the defendant, they must acquit him. The charge of the court was certainly as favorable to the defendant as he was entitled to.

The counsel for the defendant asked the court to instruct the jury that " the defendant is indicted for the crime of murder, alleged to have been committed with express malice. Express malice is defined by law to be a cool and fixed intent to commit the murder, which intent has been expressed or declared in words by the party killing, at the time or immediately before the killing takes place ; and unless the jury are satisfied, from the evidence now before them upon this trial, that the killing of the deceased was

committed by the accused after having formed his intention. to kill, they cannot find the defendant guilty of murder as. charged in the indictment.'' The charge asked by the counsel for the defendant, besides other objections, does not. give a correct definition of express malice, and the court. properly refused to give it. His definition of express malice was erroneous in stating that the malice must have been expressed or declared by the accused "in words at. the time or immediately before the killing.'' Malice, to become what the law terms express malice, need not be declared in words at all. Such malice is evidenced, not by words only (for then a dumb person or a secret assassin could never be guilty of committing a murder with express. malice), but is evidenced by external circumstances discovering that inward intention—such as lying in wait, antecedent menaces, former grudges, deliberate compassings, by the nature and character of the act done, the instrument. used, and the coolness and deliberation shown in preparing it, as well as the manner in which the murder is committed. All murder committed in the perpetration, or in the attempt. at the perpetration, of arson, rape, robbery, or burglary, under our statute, is murder in the first degree—the malice being shown by the murderer in the act of killing for such purposes.

Upon the subject of malice, and the distinction between express and implied malice, see the leading case of *McCoy* v. *The State*, 25 Texas, 33; also, that of *Farrer* v. *The State*, 42 Texas, 265.

The testimony in the record does not show that the presiding judge charged the jury as the defendant states in his. 1st and 3d reasons set out in his motion for a new trial. The charge which was submitted to the jury, taken as a. whole, fairly and distinctly presented the law of the case, and was not calculated to mislead the jury.

The only remaining question for us to decide in this opin-

ion is, as to whether or not the verdict of the jury is contrary to the law and the evidence.

It is shown by the statement of facts that John Dwyer, the deceased, was merchandizing at Oakville, Live Oak county. That about the 18th of July, 1875, he left home for Rockport, where he was going to purchase goods. That he left Oakville in an old hack, driving a brown mule and bay horse. He had a draft on the First National Bank of San Antonio, drawn by Kerr & Dewees, in favor of Hill & Dewees, for $600 silver, and indorsed in blank by Hill & Dewees. Dwyer arrived in Beeville, Bee county, on Sunday evening; then he got on a spree, and remained until Tuesday evening, the 20th of July, 1875.

He was in the coffee-house of T. H. Marsden on Tuesday morning, and was drinking. He had with him the said draft drawn by Kerr & Dewees, which at one time he had deposited with the witness Marsden. He was wearing at the time a small silver watch, which had the initials of his name engraved on the inside of the case. About nine o'clock, A. M., the defendant came into Marsden's coffee-house, when deceased recognized him, and asked him to go to Rockport with him, saying that he was well acquainted at Rockport, and if the defendant would go with him they could have a good time. Defendant first declined to go, stating that he was going to San Antonio, or in that neighborhood. Deceased insisted on defendant's going with him, agreeing, if he, defendant, would go with him, that he would pay his, defendant's, expenses, at the same time showing the defendant said draft. After examining the draft, defendant consented to go with him. Dwyer then carried him up to dinner. Defendant told the witness Riley that he had met the deceased only once before they met in his coffee-house.

Deceased asked defendant to take a drink with him; defendant declined at first, but finally did take a glass of wine. Defendant and deceased left Beeville together, in

the evening, in an old hack, driving a brown mule and a bay horse, taking the road to Rockport. They were both armed with six-shooters. They were seen in the hack, by several parties, on the Rockport road late Tuesday evening.

Very early on the following morning John Dwyer was found dead, lying on his back, by the side of the Rockport road, in Bee county, six and a half miles from Beeville. His pockets were turned out; no watch, draft, or other valuables were found on or about his person, except two 25-cent pieces, which were lying under him. The witnesses who saw his dead body believed he had been murdered in the evening or night before. He had been shot with a gun or pistol, the ball entering the top of the head, passing under the left eye and out at the mouth, and his throat was cut. There were no other wounds on the body. His left arm was powder-burnt near the wrist. There was no appearance of any struggle on the ground, or about his person. Nothing was seen of the defendant, the hack, or horses.

About the last of July, 1875, the defendant presented a draft, which was identified as the one deceased had in Beeville, to the cashier of a bank in Indianola, Texas, to be cashed. The cashier telegraphed to San Antonio in relation to it, and was answered that the draft was good, but that the man was supposed to be a robber and murderer, and to have him arrested. The matter was placed in the hands of the sheriff of Calhoun county, who arrested the defendant. At the time he was arrested he had on his person the draft, and also the watch of the deceased. An attempt had been made to scratch out the initials of the owner's name on the inside of the case.

The state further proved, by Peter Fagan, that he was at the house of the grandmother of the defendant and mother-in-law of witness about the last of July, 1875, when he saw an old hack there, also a brown mule and a bay horse.

The accused was there at the same time; saw him ride up on a bay horse. The defendant offered no evidence in his behalf.

It would be impossible, in so short a synopsis of the testimony, to show the full force of it against the defendant. It would be difficult to find a stronger case of circumstantial evidence.

We fully recognize the rule of law that, to justify a conviction on circumstantial evidence alone, the facts relied on must be absolutely incompatible with the innocence of the accused, and incapable of explanation upon any other hypothesis than that of his guilt. After calmly and dispassionately considering this case, as developed by the record, we are clearly of the opinion that the evidence is sufficient to warrant, beyond all reasonable doubt, the belief that the defendant is guilty of murder in the first degree, and that the jury were bound by their oaths to find him accordingly.

It remains for us to discharge our duty. The judgment of the district court is affirmed.

*Affirmed.*